IDA YODER *v.* CHARLESTON TRANSIT COMPANY

(No. 8529)

Submitted April 28, 1937. Decided June 15, 1937.

KENNA, PRESIDENT, dissenting.

*R. E. O'Connor* and *J. Howard Hundley,* for plaintiff in error.

*Lilly & Lilly,* for defendant in error.

MAXWELL, JUDGE:

The Charleston Transit Company prosecutes this writ of error to a judgment of the Circuit Court of Kanawha

County denying a writ of error to a judgment entered in the Common Pleas Court of that county September 5, 1936, against it and in favor of Ida Yoder in the sum of $5,000.00. The judgment was rendered in an action of trespass on the case which grew out of the plaintiff's having been struck by an automobile driven by one C. L. Wells at about eleven-thirty on the night of December 4, 1935, in Virginia Street at Quarrier Walk about midway of the fifteen-hundred block in the City of Charleston.

The assignments of error turn upon four major propositions: (1) That no vehicle owned and operated by the defendant has been in any manner by the testimony connected with the plaintiff's injury; (2) that the testimony shows that the plaintiff's own negligence was the proximate cause of her injury; (3) that in any event, the trial court erred in not setting aside the verdict and granting the defendant a new trial upon its showing of after-discovered evidence; and (4) that it was error to refuse defendant's instructions seven and thirteen.

The plaintiff and C. L. Wells, whose automobile admittedly struck plaintiff inflicting her injuries, were the only persons present at the scene of the accident who testified.

The plaintiff's testimony, in addition to a full description of her injuries with which we are not here concerned because there is no assignment of error based on the amount of the verdict, was to the effect that on the evening in question she had been visiting a friend in West Charleston, and, leaving at about fifteen minutes till eleven o'clock, boarded a West Charleston street car to return to the home of her employers, Mr. and Mrs. A. A. Lilly, in Virginia Street, just opposite the scene of the accident. In Capitol Street, she transferred to an Outer Loop car at about eleven-fifteen; this car is routed north on Capitol Street to Washington, east on Washington Street to Duffy Street, south on Duffy Street to Virginia Street and west on Virginia Street, passing the plaintiff's destination which was the stop at Quarrier Walk about midway the fifteen-hundred block, to Capitol

Street again. The plaintiff did not know the time of her arrival at the Quarrier Walk stop, but estimated that it was about eleven-thirty.

She testified that she alighted from the street car at the front and on the right side and walked to the north curb, which was the opposite side of the street from the Lilly home. There she paused. Her testimony is confusing at this point, she having stated at one time that she waited five minutes and at another time that she waited five seconds. She then walked west approximately ten steps (or ten feet as she stated at another point in her testimony) and, after having looked both ways and at a time when the street car which had proceeded on its course was about two hundred feet west of her, she started across the street. She further testified that at the time she looked, there were no vehicles approaching her from either east or west, and that there were no automobiles parked on either side of the street in the immediate vicinity; that when she had gotten into the street and was within about four feet of the north rail of the car track which extends along the middle of the street, a large, bulky vehicle running with dimmed lights loomed up and was within a very few feet of her when she first saw it; that it was running at a very fast rate of speed; that in order to escape being run down, she attempted to dodge from in front of the approaching vehicle and as she did so, she was struck by a vehicle proceeding in the same direction but to the south of the one that first bore down on her; that she knew nothing after the impact until she came to consciousness in the Wells car, and was taken by Wells to the Mountain State Hospital.

The testimony of C. L. Wells was to the effect that after having conducted a prayer service at his church in Morris Street, he went with two friends to their homes in West Charleston, after which he drove up Virginia Street, stopping at the Studebaker garage to inquire about having his car serviced. At Ruffner Avenue, which is the first street intersection west of the point where the plaintiff was struck, Wells slowed down and for the

first time noticed a bus which stopped at Ruffner Avenue for the purpose either of taking on or letting off a passenger. He proceeded up Virginia Street with the bus behind him. Two or three hundred feet west of the point of the accident, a street car going west met Wells' automobile and immediately thereafter, the bus which had been behind him pulled out to the left and started around him. Wells states he was running at the rate of between twenty-five and thirty miles an hour. At about the time the bus had gone possibly two-thirds of the way past him the plaintiff "just flashed up" out of the bus lights and before him. He immediately applied his brakes but could not stop in time to avoid striking the plaintiff with serious impact. He placed the plaintiff in his automobile and took her at once to the Mountain State Hospital were she remained for a little over four weeks, most of the time in a very serious condition. After taking the plaintiff to the hospital, Wells went to police headquarters where he reported the accident and where he talked with R. G. Lilly. He and Lilly then went to the scene of the accident and inspected two skid marks which presumably evidenced the effort of Wells to stop his automobile.

Of the witnesses for the defendant there were the two drivers of buses which covered the route past the scene of the accident the night in question. Both these men testified that they knew nothing of any occurrences such as those referred to in the plaintiff's testimony having taken place that night. It appears from their examination that they were accustomed to driving their route at the rate of twenty to thirty miles an hour. The plaintiff had introduced an ordinance of the City of Charleston restricting the speed in the area of the accident to twenty-five miles an hour.

The defendant also showed by the desk sergeant to whom Wells reported the accident at police headquarters that Wells had signed the report prepared by the sergeant in which the presence of a bus at the place of the accident was not mentioned and the accident was described by the statement that, "car traveling east on Virginia

Street struck the above named lady (plaintiff) who was crossing street." Wells had stated on cross-examination that he had told the desk sergeant exactly how the accident had happened, the same as he had described it from the witness stand.

The defendant also introduced its claim agent who testified that early on the morning immediately after the accident, he called at the home of Wells and was there told by him "all that happened was that woman stepped out from behind a street car so close in front of me I couldn't prevent hitting her." Wells denies such statement.

Under the first assignment of error, the initial question to be discussed is the assertion of the defendant that the record contains no proof that a bus owned and operated by it was present at the scene of the accident. The plaintiff did not describe the vehicle that first bore down on her as one of the defendant's buses. She referred to it as a large bulk which "had those lights up like a bus". In his examination in chief, Wells was asked if he had seen a bus owned and operated by the Charleston Transit Company. This question, of course, was leading, and objectionable also on the ground that it asked the witness for a conclusion. Nevertheless, it was not objected to and the witness replied in the affirmative. He stated that he had first seen the bus at Ruffner Avenue where it stopped and where he passed it. His testimony carries the bus to the scene of the accident and shows it to have been the same that went around his car just below the place where the impact occurred and traveling at the rate of forty-five to fifty miles an hour. On his re-cross examination, Wells stated that the bus was "kind of a dark yellow". He further stated in response to an un-objected-to leading question that it was the same color that "they" were using now. The testimony of the defendant showed it did not operate any yellow buses, and that, according to the regular schedules of the company, none of its buses would have passed the place of the accident, if on time and not ahead of time, at thirty-two minutes past eleven, which was approximately the time of the ac-

cident. Of course, the testimony of the two bus drivers to the effect that no incident like that here involved had occurred on their route that evening, tended strongly to contradict the testimony of Wells.

Under the first assignment it is also contended by the defendant that no liability can rest on it because of the fact that there is no proof, admitting that defendant's bus was at the scene of the accident, that it struck or injured the plaintiff. While this contention is advanced, it is not stressed in the brief nor was it emphasized on oral argument. We think that there can be no question that, regardless of the source of the physical force which causes an injury, responsibility for it rests on him whose negligent act was its proximate cause. 3-4 Huddy on Automobile Law (9th Ed.), section 21; 2 Berry on Automobiles (7th Ed.), section 2.333; *Judd* v. *Rudolph,* 207 Iowa 113, 222 N. W. 416, 62 A. L. R. 1174; *Paup* v. *American Telephone & Telegraph Co.,* 124 Neb. 550, 247 N. W. 411; 2 Blashfield's Cyclopedia of Automobile Law, pp. 1201-1203; *Boggs* v. *Jewell Tea Co.,* 266 Pa. 428, 109 A. 666.

The theory of the plaintiff is that the negligent act of the defendant in running its bus at an excessive and dangerous rate of speed and in not keeping a sufficient lookout placed the plaintiff in imminent peril, and that in her effort to escape from that peril, caused by the negligence of the defendant, she was injured, without fault on her part, by another vehicle.

On the basis just stated the plaintiff would be entitled to recover. But is it the true basis? Was she without fault? Or, was she negligent, and was her negligence a proximate cause of her injury? According to her own testimony, the street car had proceeded about two hundred feet from her before she started across the street, and she then looked and saw no vehicle approaching. Within that distance there was no object to obstruct her vision or distract her attention. If her view of vehicles approaching from the direction in which the street car was proceeding was at first cut off by the street car, such view necessarily became unobstructed by the car at a

distance of at least two hundred feet from the point where the plaintiff was standing. According to the testimony of the witness Wells and of the plaintiff, the bus was lighted, including dim headlights, yet she deliberately walked into the street in the path of the approaching bus, if it must be accepted under the jury verdict that there was a bus there. Accepting the testimony of the plaintiff and Wells as to the presence of a lighted bus, its lights were necessarily readily discernible to any person of normal vision. Under the circumstances in evidence, it does not suffice for the plaintiff to say she did not see the bus, or that it came into view and bore down on her with overwhelming speed after she started across the street. It is the duty of pedestrians to use their sense of sight, not casually, but carefully. And, in attempting to cross streets, pedestrians may not deliberately enter into danger which proper use of their sight would disclose to them to be impending. "To meet the requirements of the law as to looking, one must look for the purpose of finding out, and the circumstances may be such that courts will not listen to the plea of a pedestrian, that, although he looked, he did not see what was immediately in front of him and in plain view, or what he could have seen by a reasonable use of his senses in time to avoid injury." 2 Blashfield's Cyclopedia of Automobile Law, section 13. "The testimony of a witness that he looked and did not see an object which he must have seen if he had looked is unworthy of consideration." *Sullivan* v. *Smith,* 123 Md. 546, 91 A. 456.

Plaintiff's excuses and attempted justification for getting in the way of the bus must yield to the uncontroverted facts just recited. Under such facts, the question of her negligence becomes one of law to be determined by the court. The case of *Mertens* v. *Lake Shore Yellow Cab & Transfer Co.,* 195 Wis. 646, 218 N. W. 85, involves a situation where a pedestrian was struck by a motor vehicle as he attempted to cross a street, his vision in the direction from which the vehicle approached being unobstructed for a distance of two hundred fifty feet. In that case, the plaintiff testified that he looked in the

direction from which the vehicle approached and saw no automobile coming. He was struck about twelve feet from the point where he said he made the observation. The court stated that "such a situation does not present a jury question. Under such circumstances, a person is presumed not to have looked, or to have heedlessly submitted himself to the danger. He is not permitted to say that he looked, when, if he had looked, he must have seen that which was in plain sight."

"If a pedestrian looks for approaching automobiles before attempting to cross a street or highway, he is presumed in law to have seen what he should have seen had his observance been careful and attentive. He cannot justify himself by saying that he looked and did not see the approaching car that injured him, when, if he had looked, he must have seen the car. Unless there is some circumstance or condition to excuse him, his failure to see the car constitutes negligence as a matter of law." 5-6 Huddy on Automobile Law, section 90. Consult: *Carnevale* v. *McCrady-Rodgers Co.,* 318 Pa. 369, 178 A. 472; *Molda* v. *Clark,* 236 Mich. 277, 210 N. W. 203; *Silverstein* v. *Adams,* 134 Wash. 430, 235 P. 784; *Martin Baking Co.* v. *Tompkinson,* 27 Ohio App. 355, 161 N. E. 288.

Accepting the plaintiff's testimony that she looked east and west before starting across the street, and at that instant she saw no vehicles approaching from the east or west, but that beyond the distance of two hundred feet on the west her view was obstructed by the street car moving westward, we are of opinion that her act merely of looking when she says she looked does not absolve her from blame nor relieve her of further duty respecting her own care and safety, nor warrant her in heedlessly pursuing her course across a much traveled street without further apprising herself of the approach of motor vehicles.

Plaintiff's conduct, under the circumstances, was not such as would be expected of a reasonably prudent person in the exercise of care for her own safety. In such instance, the trial court should have directed a verdict for the defendant. *McLeod* v. *Laundry,* 106 W. Va. 361,

145 S. E. 756; *Craft* v. *Coal Co.*, 114 W. Va. 295, 171 S. E. 886; *Wood* v. *Shrewsbury,* 117 W. Va. 569, 186 S. E. 294.

This conclusion eliminates necessity for consideration of other assignments of error.

For reasons stated and on principles applied, the judgment of the trial court is reversed, the verdict of the jury set aside, and the case remanded.

*Reversed and Remanded.*

Fox, Judge, concurring:

I concur in the reversal of this case, but I am not entirely persuaded that the trial court, should, as a matter of law, have directed a verdict for the defendant on account of the contributory negligence of the plaintiff.

I would reverse the case on the refusal of the court below to give instruction No. 13 offered by the defendant. This instruction reads:

> "The Court instructs the jury that the defendant at the time of the accident had the right to run its bus under proper circumstances in any part of the street and the fact alone that the bus may have been on the left side of the street in itself does not make negligence and does not impose any liability on the defendant."

The plaintiff's declaration averred, among other things, that it was the duty of the defendant to operate its bus "on the right side of the public street" and then further averred that "while undertaking to pass said automobile the defendant operated said bus at a negligent, illegal, fast and high rate of speed to the left of the center of said Virginia Street so as to cause said bus, being so negligently operated as aforesaid, to be driven and headed in the direction in which plaintiff was standing," and thus caused the injuries of which the plaintiff complains. These allegations, and the evidence in support thereof, seem to me to present the question of the right of the defendant to be on the left side of the street, under any circumstances, and I think that the defendant was entitled to an instruction that the fact that its bus may have

been, under proper circumstances, on the left side of the street, was not, alone, sufficient to convict it of negligence. The fact that, at the time of the accident, it may have been attempting to pass another vehicle, as it had the right to do, was, in my judgment,the "proper circumstances" mentioned in the instruction refused.

KENNA, PRESIDENT, dissenting:

I do not think that the proof in this case discloses plainly that the plaintiff was guilty of contributory negligence. In the state of this record, that question must be determined upon the proof of the plaintiff and very largely upon her own testimony.

The plaintiff got off the west bound street car at Quarrier Walk and prudently went to the sidewalk on the right or north, which was on the opposite side of the street from her destination. Obviously, she did this in order to avoid the danger of standing in the street until the street car had passed and then crossing behind it.

The plaintiff testified that, having gotten to the north curb, she waited an appreciable length of time. At one point she says she waited for about five minutes. The circumstances render this statement plainly incorrect. At another point she says she waited about five seconds. Probably the fact lies between these two estimates. She then walked west in the same direction that the street car was going. At one point she said she walked ten steps; at another, ten feet. Again it is obvious that the plaintiff was making estimates under circumstances rendering exact statements of time and distance impossible. Her testimony shows that she is a person who cannot make accurate estimates of time and distance. This fact, coupled with the nervousness upon the witness stand that its realization on plaintiff's part would induce, I think would warrant a jury in applying such estimates as she made and fitting them into the other circumstances with some degree of liberality.

Having reached the north sidewalk and having waited, according to plaintiff's testimony, she looked both ways before going into the street. In the meantime, the street

car had proceeded west a distance of approximately 200 feet.

The principal opinion refers to plaintiff as having testified that she looked to the west, the direction in which the street car was going, as she started across the street. I do not so read her testimony. I think she stated that she looked both ways before she started to cross the street, but I do not think that she undertook to state at exactly what moment she looked either way. Here, I think are the points in her testimony which govern this question:

Direct Examination, Record, p. 47, *et seq.*

"A.   I got off the street car and I walked to the sidewalk and I looked down the street as I was walking, and I walked down a piece to be sure that there was no traffic, I looked both ways and I started across, got about four or five steps across and all at once I saw the flare of the lights and the bulk of something coming at me, and when I saw this it scared me and I started to run, and I didn't see anything—no other car—so when I started to run that was all I knew. I was evidently knocked unconscious.

Q.   Now the jury may not have heard it. I don't want to repeat, but I would like to get this in the record. When you got off the street car you say you got off of the right side on the front end?

A.   Yes, sir.

Q.   Just a few feet above Quarrier Walk?

A.   Yes, sir.

Q.   And where did you go then?

A.   I walked to the sidewalk and walked down—

Q.   Which sidewalk? Was that the one—

A.   The north.

Q.   That was on the same side you got off on?

A.   Yes, sir.

Q.   And the opposite side from where the Lillys live?

A.   Yes, sir.

Q.   When you got to the sidewalk what did you do then?

A. I walked down the street a piece—

Q. About how far did you walk?

A. Well, about ten steps, I guess.

Q. Do you know how far you walked?

A. Well, I will say about ten feet.

Q. About ten feet. Where would that be with reference to where Quarrier Walk was?

A. Yes.

Q. About there?

A. About Quarrier Walk.

Q. The street car had gone on, as I understand, that you got off of?

A. Yes, sir.

Q. Then after you got over on the sidewalk, on the right side as you face west, that is, opposite to where you were working, you walked down along the sidewalk the way the street car was going about ten feet?

A. Yes, sir.

Q. As you walked down there did you notice the street car and whether there was any traffic coming up meeting the street car?

A. I looked, but I didn't see any.

Q. Where did you look?

A. I looked down the street.

Q. What time did you look down that way, or how long?

A. Well, about five minutes.

Q. As you walked down west along the sidewalk there before you started across to the house, what were you doing then?

A. I was waiting for the street car to get on so that I could see if there was any traffic in my way.

Q. Well, were you looking to see if there was any traffic down there?

A. Yes, sir.

Q. What did you see down west? That is, the way you were walking and the way the street car was going, what traffic did you see?

A. I didn't see anything.

Q. Where was the street car when you last saw it, or when you started across to home?

A. It was down about the third house, about two hundred feet.

Q. About the third house west?

A. Yes, sir, west.

Q. About two hundred feet. Do you know

where that would be with reference to where Houston G. Young lives?

A. Yes, it is right in there close to him.

Q. When you started across did you look any other way besides out toward where the street car was down next to Houston Young's?

A. I looked east.

Q. Which direction was that?

A. It was to my left, up the street.

Q. Up Virginia Street. Now, was there any traffic in that direction?

A. No.

Q. Were there any parked cars along there?

A. No.

Q. How far had you gotten when you first ascertained that this bus was—

Mr. Hundley (Interrupting): Wait a minute. She never said there was any bus there. She said it was a light. Now we don't want him to lead her on that.

Gen. Lilly: All right, if that is leading.

Q. Now you state that after having looked west there as you detail and seeing no traffic except the street car down at Mr. Young's you started across home. How far did you get before anything occurred?

A. About four steps."

Cross Examination, Record, p. 63, *et seq.*

"Q. Did you look before you went over?

A. Yes, sir.

Q. Which way did you look?

A. I looked both ways.

Q. How far down, that is, down this way, could you see on Virginia Street?

A. About two hundred feet.

Q. About how many houses?

A. Three.

Q. And where was the street car at that time?

A. It was just below the third house.

Q. And did you see any motor vehicles on the street?

A. Not until I started across.

Q. No, I mean before you started.

A. No.

Q. Did you look before you stepped out in

the street?

A. Yes.

Q. Did I understand you to say that you looked toward the Capitol too?

A. Yes.

Q. How far could you see up that way?

A. Well, that street is very straight up through there. I don't know just how far, but it is a long ways.

Q. The fact of the matter is, Miss Yoder, it is straight both sides of Quarrier Walk for a considerable distance, isn't it?

A. Yes.

Q. When you entered the street how far did you go, did you say, until you looked up?

A. About four steps."

On the basis of this testimony, I think that it is entirely reasonable to conclude from the plaintiff's direct statement and from the plain inferences to be drawn from her testimony, that after she reached the north curb, she walked west and while doing so, of course, looked in that direction. She observed the street car to be approximately 200 feet away with no other vehicle in sight. As she stepped into the street she turned to look behind her toward the east. This was quite natural because it was from the east that the traffic would be coming on the side of the street she first entered. At this moment, the Wells car with the bus behind it passed the street car only a little more than 200 feet, or a little less than that distance, away. We must remember that we are necessarily dealing with estimates of time and distance.

Immediately after the bus passed the street car, it undertook to pass the Wells car going in the same direction it was going. Wells testified that when the bus passed his car, it was going between forty-five and fifty miles an hour. At fifty miles an hour, it would be moving seventy-three feet a second, or at a speed that would take it from the point where it passed the street car to the point where the plaintiff was injured in about three seconds. Stating this conclusion in another way, about three seconds was all the time that necessarily elapsed from the time that

plaintiff looked toward the west and saw no traffic other than the street car, until the plaintiff was injured. I think that it is perfectly consistent with the plaintiff's testimony to infer that during that time she was looking east in order to assure herself that as she stepped into the street there was no approaching traffic on the near side of the street. She had looked west before entering the street, and before reaching the middle of the street and entering that part of it where she was expecting east bound traffic, she looked west again. At that moment, the bus was almost upon her, and on the left side of the street.

I freely confess that the theory I am advancing which I think the jury would have been warranted in adopting, requires close figuring of time and distance. But so does the theory which convicts plaintiff of contributory negligence, and the rule is that the liberality of inference and deduction must be indulged in favor of the verdict of the jury and not against it. If it is a matter of seconds the plaintiff now, standing on her verdict, is entitled to the benefit of any doubt.

This proof shows that the defendant's bus was moving up Virginia Street at an excessive and unlawful rate of speed; that it attempted to pass the Wells automobile without sounding a horn or other warning, which was a direct violation of the statute. Code, 17-8-5. Under these circumstances, conceding that the same rule applies to city streets that applies to highways, which I am inclined to doubt, I do not believe that it would have been proper for the trial court to have given the instruction telling the jury that the defendant had a right to run its bus in any part of the street. I do not believe that it was incumbent upon the plaintiff to anticipate that the bus would, without warning, be on the left side under the conditions shown.

I think the question of contributory negligence depended upon not more than a second or two of time and was too close a thing for this court to deal with as a matter of law.